JUDGE BUCHWALD

'08 CIV 5308



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————X

      :

ROGER MENDA and PUNIT MENDA    :   CIVIL ACTION NO.

      :

      :

     Plaintiffs,    :

      :   COMPLAINT

      :

     vs.    :

      :

      :

      :

      :

ERWIN S. BRAICH, SATINDER DHILLON,    :
TALIA K. BRAICH, JAMES NEKRASOFF, and    :
TALER RESOURCES INCORPORATED,    :

      :

     Defendants.    :

—————————————————————X

Plaintiffs Roger Menda ("R. Menda") and Punit Menda ("P. Menda", and together with

R. Menda, the "Plaintiffs"), by their attorneys, Poppe & Bhouraskar, LLP, for their Complaint

herein, respectfully allege the following facts upon knowledge, with respect to their own acts,

and with respect to all other facts, upon information and belief based on communications from

and statements made by each of the defendants, and upon an investigation conducted by

Plaintiffs and their counsel, including, among other things, interviews with third parties, a review

of public filings, press releases, news, and research reports about the Defendants, and upon other

information available to the public:

## NATURE OF THE ACTION

1.    At all times relevant herein, defendant Erwin S. Braich. ("E. Braich"), through and

together with defendants Satinder Dhillon ("Dhillon"), Talia K. Braich ("T. Braich") and James

Nekrasoff ("Nekrasoff" and, together with E. Braich, Dhillon, and T. Braich, the "Individual

Defendants") conducted, directed and otherwise controlled the business of Taler Resources

Incorporated ("Taler" or the "Company" and, together with the Individual Defendants, the

"Defendants"), and represented to Plaintiffs that they were engaged in the business of purchasing,

selling or otherwise trading scrap metal and other commodities throughout the World

("Defendants' Business") and, more particularly, that Defendants, through Defendant Taler, had

acquired the right to purchase 600,000 metric tonnes of nonferrous  and ferrous scrap metal for

$15 per metric tonne from the Ministry of National Defense in the Democratic Republic of the

Congo (the "DRC Contract") as part of Defendants' Business.

2.    Defendants actively and fraudulently solicited Plaintiffs from outside of and within the

State of New York to purchase unregistered securities and to invest in a business that Defendants

knew that they would not properly fund and/or participate in, and by virtue thereof, Defendants

knew that the statements that they made to Plaintiffs were untrue or materially incorrect and

made with the sole purpose of misappropriating Plaintiffs' money for their personal use.

3.    The stated purpose of the transactions complained of herein, as articulated and represented

by the Individual Defendants to Plaintiffs, was for Defendants to sell Plaintiffs 10% of the

securities issued by Taler and a share of and participation in the DRC Contract, in exchange for

Plaintiffs' investment.  Defendants also represented to Plaintiffs, as consideration for their

investment, that Plaintiffs would receive, among other benefits, the right to organize and staff a

commodities trading business in New York, and that Plaintiffs' investment in Taler would

2

provide Plaintiffs, through Defendants and Defendants' Business, with access to numerous opportunities to purchase, finance and sell commodities in international markets.

4. Defendants, however, as more particularly alleged herein, fraudulently devised and carried out a sham transaction where they (i) solicited and induced Plaintiffs to make an investment ("Plaintiffs' Investment") in Taler and the DRC Contract , (ii) misrepresented that Defendants, through Taler, would perform the DRC Contract , and (iii) sold Plaintiffs securities in Taler warranting that Plaintiff's Investment would be applied to the DRC Contract, notwithstanding Defendants' specific knowledge at the time that their representations were made to Plaintiffs, that Defendants were not performing and did not intend to perform the DRC Contract or to provide Plaintiffs with the international commodities business opportunities that were described and represented by Defendants to Plaintiffs.

5. Through their knowingly orchestrated misrepresentations as particularized in this Complaint, Defendants were able to profit in the amount of $340,000.00 through their fraudulent sale to Plaintiffs of an interest in a business that Defendants' did not intend to engage in and/or share with Plaintiffs, thereby causing Plaintiffs to suffer a loss of $340,000.00 plus additional benefits, such as profits in the proposed transaction and interest on the sum invested by Plaintiffs, which, despite Plaintiffs' demand for the same and Defendants' promises and obligation to refund same, Defendants have refused to return or otherwise pay to Plaintiffs.

6. By virtue of the conduct alleged herein, the Defendants, directly or indirectly, singly and in concert, have engaged and are engaging in acts, practices and courses of business that constitute violations of law as more particularly described herein, including, but not limited to, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b),

3

and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5, Section 20(a) of the Exchange Act, 15 U.S.C.

§ 78t (a), breach of contract, conversion, and common law fraud.

## JURY DEMAND

7.    Plaintiffs hereby demand a trial before a jury.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, pursuant to

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 29(b) of the Exchange Act, 15 U.S.C.

§78cc(b), Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) Section 20(a) of the Exchange

Act, 15 U.S.C. §78t(a), and the rules and regulation, including SEC Rule 10b-5, promulgated

thereunder, , 17 C.F.R. §240.10b-5, pursuant to 15 U.S.C. §77v, and pursuant to this Court's

supplemental jurisdiction over the related state law claims asserted herein in accordance with 28

U.S.C.§1367.

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 (Diversity of

Citizenship), as the matter in controversy exceeds the sum or value of $75,000.00, exclusive of

interest and costs, and is between citizens of a state and citizens or subjects of a foreign state

10.    Venue lies in this Judicial District pursuant to the Exchange Act, 15 U.S.C. §77v, 15

U.S.C. § 78aa and 28 U.S.C. § 1391 (a) and (b), because the acts and transactions constituting

the violations set forth in this Complaint occurred in substantial part in this Judicial District,

including that Defendants transmitted materially fraudulent, false and/or misleading information

into this Judicial District and solicited Plaintiffs' investment in Defendant Taler and the DRC

Contract in this Judicial District.

11.    The Defendants, directly and indirectly, have made use of the means and instrumentalities

of interstate commerce, or of the mails, telephones and the internet from foreign countries and

from outside of New York State in connection with the transactions, acts, practices and courses of business alleged herein.

12. Defendants conduct business in this Judicial District.

## THE PARTIES

13. Plaintiffs are residents of the State of New Jersey and conduct business in the State of New York and in this Judicial District.

14. Upon information and belief, defendant E. Braich is an individual and a citizen of Canada with a residence of 33474 Kingsley Terrace, Abbotsford, Canada V2S 6J6.

15. Upon information and belief, defendant Dhillon is an individual and a citizen of Canada who also maintains a residence at 2816-1942 West Lake Avenue, Seattle, Washington.

16. Upon information and belief, defendant T. Braich is an individual and a citizen of Canada with a residence at 33474 Kingsley Terrace, Abbotsford, Canada, V2S 6J6, and the daughter of Defendant E. Braich.

17. Upon information and belief, defendant Taler is a corporation incorporated under the laws of Antigua and Barbuda with offices at Lower Factory Road, St. John's, Antigua, West Indies. Upon information and belief, defendants E. Braich, T. Braich, Dhillion and Nekrasoff are direct and/or indirect owners of Taler and operate, supervise and control the operation of and derive economic benefit from the business of Taler, including the monies transferred by Plaintiffs, as installments of Plaintiffs' Investment, at the Individual Defendants' direction.

18. Upon information and belief, defendant Nekrasoff is a citizen of Canada with residences in Canada and Antigua, West Indies and the President and Managing Director of Taler.

## FACTS COMMON TO ALL COUNTS

19. Plaintiffs are informed and believe, and on that basis aver, that at all times relevant herein, in exchange for financial and other consideration, including, but not limited to, a share of the money paid to Defendants by Plaintiffs, the Individual Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make their statements made to Plaintiffs not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in an effort to secure Plaintiffs' Investment for their personal use, which personal uses were not disclosed to Plaintiffs. All Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

20. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives, controlling shareholders, directors, employees, knowledgeable close family members and/or agents of Taler and members of Taler's management team or had control thereof at all times relevant to Plaintiffs' Complaint; (ii) each of the Individual Defendants, by virtue of his/her responsibilities and activities as an officer, director, controlling shareholder, employee, agent, member of the Taler management team and/or recipient of a portion of Plaintiffs' Investment was privy to and participated in the creation, development and reporting of Taler's business, the DRC Contract and the scheme to defraud Plaintiffs; (iii) each of Individual Defendants, at all times relevant to this Complaint, enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to the other members of Taler's management team, internal reports and other data and information about the Taler's finances,

6

operations, and sales and the DRC Contract and was advised of and had access to Plaintiffs'
Investment; and (iv) each of the Individual Defendants had actual knowledge of the
misrepresentations and omissions of material facts set forth herein, or acted with reckless
disregard for the truth in that they failed to ascertain and to disclose such facts to Plaintiffs, even
though such facts were available to them; and (v) each of the Individual Defendants' material
misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and
affect of concealing Taler's operating condition, the status of Taler's performance of the DRC
Contract, and Taler's future business prospects from Plaintiffs in order to solicit and to obtain
Plaintiffs' Investment.

21. Plaintiffs are informed and believe, and on that basis aver, that Defendants E. Braich, T.
Braich, and Dhillon, with the knowledge and authorization of Defendants Nekrosoff and Taler,
traveled into the State of New York and to this Judicial District in order to assist in soliciting
Plaintiffs' Investment in Taler and the DRC Contract, which solicitations were memorialized, in
part, by a document signed and delivered to Plaintiffs by Dhillon (the "Defendants' Written
Solicitation") a copy of which is annexed hereto as Exhibit "A".

22. At all times relevant herein, defendant Dhillon, was authorized and instructed by E.
Braich, T. Braich, Nekrasoff and Taler to act on their behalf as their agent to solicit Plaintiffs'
Investment in Taler and to sign and deliver the Defendants' Written Solicitation.

23. During the period relevant to Plaintiffs' Complaint, the Individual Defendants, as officers,
insiders, directors and/or control persons of Taler were privy to confidential and proprietary
information concerning Taler, its operations, finances, financial condition, present and future
business prospects including the DRC Contract, andthe Individual Defendants also knew that

Plaintiffs' Investment would not be used for Taler's corporate operations or the DRC Contract
and would, instead, be applied to and for their personal use.

24. Each of Individual Defendants are liable as direct participants in, and as co-conspirators
with respect to, the wrongs complained of herein. In addition, the Individual Defendants, by
reason of their status as senior officers and/or directors, major shareholders or beneficial owners
of Taler and/or by reason of the Individual Defendants' control of voting rights in and to Taler
stock, were "controlling persons" and because of their positions of control, the Individual
Defendants were able to and did, directly or indirectly, control and/or possessed the authority to
control the conduct of Taler's business.

25. The Individual Defendants, because of their positions with the Company, controlled the
DRC Contract and Plaintiffs' Investment. The Individual Defendants each had the ability and
opportunity to and did direct the payment of Plaintiffs' Investment and had the ability and
opportunity to prevent the misappropriation of Plaintiffs' Investment, and each of the Individual
Defendants had the ability and opportunity to cause such misappropriation to be corrected. Thus,
the Individual Defendants had the opportunity to and did, in fact, commit and/or failed to prevent
the fraudulent acts alleged herein.

26. Each of the Individual Defendants  failed to inform Plaintiffs of the Individual
Defendants' misappropriation of Plaintiffs' Investment in Taler and the DRC Contract.

27. Each of Individual Defendants are liable as a participant in a fraudulent scheme and course
of conduct that operated as a fraud or deceit on Plaintiffs by disseminating materially false and
misleading statements and/or concealing material adverse facts from Plaintiffs. Each of the
Individual Defendants deceived the Plaintiffs regarding Defendants' Business, Taler's

8

performance of the DRC Contract, which enabled the Individual Defendants to secure the material portion of Plaintiff's Investment for their personal use.

28. Each of the Defendants acted with scienter in that they knew or recklessly disregarded that the statements issued or disseminated by them or in the name of Taler to Plaintiffs were materially false and misleading; knew that such statements or documents would be issued or disseminated to the Plaintiffs and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and the misappropriation of Plaintiffs' Investment.

29. The ongoing fraudulent scheme described in this Complaint could not have been perpetuated, or occurred, without the knowledge and complicity of each of the Individual Defendants.

30. Each of the Individual Defendants had actual knowledge or was reckless in not disclosing to Plaintiffs that Plaintiffs' Investment was not invested in the DRC Contract, that neither Taler nor the Individual Defendants were performing the DRC Contract, and that the Defendants were engaging in a pattern of egregious self-dealing.

31. Commencing in August, 2006, and continuing through to the date of this Complaint, Defendants concealed their true purpose and activities from Plaintiffs, and that concealment has continued up to and until the filing of this Complaint.

32. At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true and relied on them in making Plaintiffs' Investment and up and until the filing of Plaintiffs' Complaint. Had Plaintiffs known the truth regarding Defendants' Business, Taler, the DRC Contract and Defendants' misappropriation of Plaintiffs'

Investment, which were not disclosed by Defendants, Plaintiffs would not have made Plaintiffs' Investment.

33. Defendants, despite Plaintiffs' demand there for, failed to provide Plaintiffs with accurate and material information on Taler and the DRC Contract, failed to perform the DRC Contract, failed to provide appropriate documentation of Plaintiffs' Investment, failed to apply the funds invested by Plaintiffs to the DRC Contract or to Taler's business, and failed to form and staff a commodities trading business in New York.

34. As a direct result of, and in reliance on the foregoing untrue statements of material facts and omissions of material facts, particularized, without limitation, herein, Plaintiffs' at the direction and with the knowledge of the Individual Defendants paid Plaintiffs' Investment, via wire transfers, as follows:

| | | | |
|---|---|---|---|
| a) | August 28, 2006 - | $150,000 | to Defendant Dhillon |
| b) | September 11, 2006 - | $ 35,000 | to Jack Morrison |
| c) | September 12, 2006 - | $ 40,000 | to Defendant Dhillon |
| d) | October 13, 2006 - | $ 25,000 | to Defendant T. Braich |
| e) | November 1, 2006 - | $ 10,000 | to Defendant T. Braich |
| f) | November 6, 2006 - | $ 40,000 | to Defendant T. Braich |
| g) | December 5, 2006 - | $ 40,000 | to Hugh W. Berry, Esq. |

Copies of the confirmations of the wire transmittals of Plaintiffs' Investment are attached hereto as Exhibit "B".

35. Despite demand for the same, Defendants have failed to return the monies paid to them by Plaintiffs.

## SPECIFIC ALLEGATIONS OF SCIENTER

A.    **The Individual Defendants' solicitation of Plaintiffs' Investment in New York**

36. On or about August 23, 2006 Defendant E. Braich met with Plaintiffs at Plaintiffs' office in Manhattan and at the meeting he first solicited Plaintiffs' Investment from Plaintiffs and stated that:

a)    He owned and/or controlled the operations of Defendant Taler, Defendants' Business and the DRC Contract; and

b)    The Individual Defendants were members of a "team" and were engaged in numerous multi-million dollar transactions in the international commodities market; and

c)    In the event Plaintiffs agreed to make Plaintiffs' Investment, Plaintiffs could be part of E. Braich's and the other Individual Defendants' "team" in the international commodities business and the business of Taler including, but not limited to, the DRC Contract; and

d)    That Defendants had received offers for and were prepared to ship scrap metal through Taler and the DRC Contract to third party purchasers; and

e)    A portion of Plaintiffs' Investment would be used to establish a New York business which would be run by Plaintiffs out of offices selected and staffed by Plaintiffs and which would engage in international commodities transactions together with Plaintiff E. Braich and the other Individual Defendants; and

f)    Defendant E. Braich was multi-millionaire who did not need Plaintiffs' Investment which he was taking as a favor to Plaintiffs in order to give

Plaintiffs the opportunity to demonstrate their seriousness to join the "team" and establish a trading business and because the Individual Defendants needed to see that Plaintiffs were "committed".

37. Upon information and belief each of E. Braich's representations were known by E. Braich to be false; in that:

    a)    Defendant E. Braich did not intend to make Plaintiffs part of his "team" in an ongoing international commodities trading business; and

    b)    Defendant E. Braich had no intention of creating a new business entity in New York to be operated, staffed and managed by Plaintiffs and E. Braich; and

    c)    Defendant E. Braich did not intend to apply Plaintiffs' Investment to Taler's business or the DRC Contract; and,

    d)    Defendants did not have offers for and were not prepared to ship scrap metal through Taler and the DRC Contract to third party purchasers; and

    e)    Defendant E. Braich did not possess the personal wealth he claimed to and was, in fact, without any personal assets; and,

    f)    Defendant E. Braich intended to use a material portion of Plaintiffs' Investment for his personal use.

38. On or about August 24, 2006 Defendants E. Braich, T. Braich and Dhillon meet with Plaintiffs at Plaintiffs' offices in Manhattan and represented to Plaintiffs that:

    a)    T. Braich was a principal shareholder of Defendant Taler through a trust controlled by Defendant E. Braich; and

12

b) Defendants' Business consisted of numerous multi-million dollar commodities transactions which Plaintiffs, through Plaintiffs' Investment, would gain access to; and

c) Defendant Taler's business was managed by, Defendant E. Braich and his "team" which included the Individual Defendants and would grow to include numerous commodities transactions; and

d) Defendants had received offers for and were prepared to ship scrap metal through Taler and the DRC Contract to third party purchasers; and

e) Plaintiffs' Investment in Taler would lead to millions of dollars in profits on the DRC Contract and a partnership between Plaintiffs and Defendants in Defendants Business and would be a great opportunity for Plaintiff P. Menda to participate in the management of Defendants' Business.

39. Each of the foregoing statements were material and were made by E. Braich, T. Braich and Dhillon in each other's presence to Plaintiffs and each of E. Braich, T. Braich and Dhillon knew that the foregoing statements were untrue; in that:

a) The Individual Defendants did not intend to use Defendant Taler to engage in numerous commodities transactions; and,

b) The Individual Defendants did not intend to enter the commodities trading business with Plaintiffs; and,

c) The Individual Defendants had not taken and did not intend to take any material action to perform the DRC Contract; and

d)      Each of the foregoing representations were made by or in the presence of Defendants E. Braich, T. Braich and Dhillon in order to obtain Plaintiffs' Investment for their personal use.

e)      The Individual Defendants each knew or had reason to know that Plaintiffs' Investment in Taler would not lead to millions of Dollars in profits on the DRC Contract and a partnership between Plaintiffs and Defendants in Defendants Business; and

40.  Thereafter, on August 24, 2006 at a meeting attended by Plaintiff P. Menda and Defendants E. Braich, T. Braich and Dhillon, Defendants E. Braich, T. Braich and Dhillon represented that:

a)      Taler had taken the necessary steps to deliver scrap metal on the DRC Contract; and

b)      In return for Plaintiffs' Investment, Plaintiffs would receive 10% of Taler's stock and 10% of the profits on the DRC Contract; and

c)      Defendants were ready to ship scrap metal pursuant to the DRC Contract in September, 2006; and

d)      Fulfillment of the DRC Contract was simple because buyers were already setup; and

e)      A portion of Plaintiffs' Investment would be used to establish a New York business which will be run by Plaintiffs out of offices selected and staffed by Plaintiffs and would engage in international commodities transactions together with Plaintiff E. Braich; and

14

     f)     If Plaintiffs, for any reason and at any time, requested a return of the amount

of Plaintiffs' Investment, then, upon the receipt of Plaintiffs' request,

Plaintiffs' Investment would be immediately repaid by Defendants.

41. Each of the foregoing statements were material and were made by E. Braich, T. Braich and Dhillon in each other's presence to Plaintiff P. Menda and each of E. Braich, T. Braich and Dhillon knew that the foregoing statements were untrue in that:

     a)     Buyers were not already committed to purchase scrap metal obtained through

the DRC Contract; and

     b)     Defendants E. Braich, T. Braich and Dhillon did not intend to refund

Plaintiffs' Investment upon Plaintiffs' request; and

     c)     Defendants E. Braich, T. Braich and Dhillon knew that Defendants had not

begun to cut or prepare scrap metal for shipment, did not have the equipment

to cut or prepare to ship the scrap metal, and were not ready to ship or deliver

for shipment the scrap metal on the DRC Contract in September, 2006; and

     d)     Defendants E. Braich, T. Braich and Dhillon intended to secure the material

portion of Plaintiffs' Investment for their personal use.

## B.    **Defendants' Written Solicitation**

42. On or about August 30, 2006, Defendant Dhillon delivered Defendants' Written Solicitation, dated August 29, 2006, signed by Defendant Dhillon in New York, which, among other things, represented that:

     a)     "…a comprehensive detailed written contract for the aforementioned purchase

and sale of equitable shares is to be drafted by the respective attorneys as

selected"; and

b)    "As agreed by all parties, in the event that a mutually acceptable written contract is not agreed upon and duly executed by all parties (for whatever reason by either side) this first payment is to be considered a noninterest bearing demand loan to be repaid within seventy-two hours of notice."; and

c)    "The $150,000.00 has been received by Mr. Satinder Dhillon (as directed by Taler Resources Incorporated) and as per agreement is to be repaid by Mr. Satinder Dhillon, in the event the contemplated transaction between the parties is not finalized by October 25th, 2006."

43.  Each of the foregoing statements in the Defendants' Written Solicitation, among others, was known by Dhillon and Defendants E. Braich, T. Braich and Nekrasoff to be false; in that:

a)    the Individual Defendants never intended to execute "a comprehensive and detailed written contract", and did not take any steps to do so; and

b)    Plaintiffs have repeatedly requested a refund of Plaintiffs' Investment from the Individual Defendants and, notwithstanding such repeated requests, same has not been refunded; and

c)    The Individual Defendants never intended to return Plaintiffs' Investment in the event Plaintiffs requested such a return, and, instead, the Individual Defendants intended to take the material portion of Plaintiffs' Investment for their personal use.

C.    **Defendants Written Statements and Correspondence to Plaintiffs.**

44.  On or about September 2, 2006 Defendant E. Braich wrote to Plaintiffs and copied Defendants Dhillon and Nekrasoff as follows:

16

"By the way, the first 40,000 mt of Taler's scrap from Demoncratic Republic of Congo are sold (as of yesterday) to a Turkish party. Both HMS 1&2 at the price of NET US $229/mt on an FOB Basis at the port. For good reasons I agreed to pay $9/mt commissions. Gross price is US $238/mt actually. L/C's will be confirmed by Citibank or HSBC and will be ready in about two weeks.......for October shipment."

45. On or about September 10, 2006 Defendant E. Braich wrote to Plaintiffs as follows:

"We will speak of the structure of new and old companies on the telephone in the next few days. We are currently working on various methods of structuring this and enabling you to have 50% of the votes and notwithstanding lessening the income tax impact. This is a good problem to tackle!"

"Just a heads up however. Only if it is at all possible without causing an inconvenience, we may request that your Dad forward some funds by wire to Rawbank in DRC directly. This would be in lieu of the $150,000 towards the end of October. This means instead of keeping $100,000 for the New York office costs and staff that you will hire eventually.......maybe we can split this $150,000 in half. $75,000 to the project directly to Kinshasa, DRC, and keep the balance of $75,000 for the overhead..."; and

"By the third payment due date, as contemplated, we will have loaded, shipped, and collected on cargoes already. For this L/C processing etc. you are totally in charge. The last $150,000 (due around Christmas) could be deducted from L/C proceeds when due. In other words this $75,000 should be the last serious cash outlay for you other than your salary, travel, office rent contribution, etc."; and,

46. On or about September 11, 2006, Defendant E. Braich wrote to Plaintiffs as follows:

"I have sent to Satinder a copy of the e-mail that I sent to you. I am sending you the bank co-ordinates in DRC for Jack Morrison. Hopefully you have spoken to your Dad about what I had suggested. If he is willing and able to help...please wire directly to Jack's account...say US $30,000-35,000...."

"Satinder will call you to discuss the remaining $40 or 45 thousand. For him the Western Union payments to various parties in DRC are easier from Washington State than from Canada. This is due to no currency exchange involved."; and,

"The Chinese have arrived in the DRC to start the cutting etc. We need to advance them only (as per contract) for their accommodation etc. immediately......I understand from Nito and Jack that it (the housing) very fortunately and conveniently is walking distance to the first big piles of scrap that need to be worked on! This advance and any others will be deducted from work in progress."; and,

47. On or about September 12, 2006 Defendant Dhillon wrote to Plaintiffs and Defendant E. Braich as follows:

> "It's good to be back home. I had not seen my family and friends in months.
>
> I trust everything is fine with you. You have certainly joined the group at a perfect time for everyone. It is really great to see someone else that is young show so much interest in working and learning.
>
> Attached are my coordinates for the $40,000. Erwin and I have discussed briefly where and who in the DRC needs what amounts.
>
> > Bank of America
> > 444-B Cherry Street
> > Sumas, Washington 98295
> > 206-461-0800
> >
> > Account#68110972
> > Routing Number: 026009593
> >
> > Satinder Dhillon
> > #2816-1942 Westlake Ave
> > Seattle Washington 98101"

48. On or about September 13, 2006 Defendant E. Braich wrote to Plaintiffs as follows:

> "On the recent funds sent; Jack keeps very accurate accounting...should anything be questioned. Also, we have a good and solid relationship with the folks in the U.S. Government...in Homeland Security, the State Dept., and others...."

49. On or about October 3, 2006 Defendant E. Braich wrote to Plaintiffs as follows:

> "Talia and I are nearly finished with the discussions and tours with the importers/farm associations in Southern Vietnam and Cambodia."
>
> "This will enable me to meet the powers of the State owned parent of Southern Steel Corporation in Hanoi, as well. Their Deputy General Director spent a few hours with me in their Saigon offices one day last week. Quite interestingly, just a few weeks ago, they opened a US $160 million turn-key plant in Phu My (where we also unload fertilizer) not far from here! All of the scrap that they need is shipped in to the plant. They are in critical need of this material. Remember they do not really care about profit....just output and keeping things going! More on that when we meet."; and,

"We need to speak about some things..like the Mert transaction (which I understand may not be alive any longer), the possibility of postponing Dubai for now, your desire and ability to accompany Talia and I to Mozambique and South Africa asap (I will send to you an e-mail and attachment re: an item on the agenda for this trip), setting up offshore (say Mauritius), etc."; and,

"I will telephone you early one day this week to discuss these matters and others"; and,

"Taler Resources Incorporated has now been officially issued the "ferrous export" license from the government. I will scan it to you when I receive it. Also, near to the port of Matadi (at another port named???); yet another senator has offered us today a small volume (about 5,000mt) of pre-cut HMS 1&2 for US $85/mt FOB portside. This could be used for trans-shipment with the first load or whatever. What do you think? Nito has not seen this material yet."

50. On or about October 11, 2006 Defendant E. Braich wrote to Plaintiff P. Menda and copied

Plaintiff R. Menda as follows:

"There are many options, decisions, and much strategy to plan. I want your input with these items. We should travel to Africa soon, as I stated in an e-mail earlier. It would be great to delegate duties and lessen my workload. Currently it (my meeting schedule and responsibilities) is immense. Actually, too much. I wish that I was "globe-trotting" as your dear Dad calls it! Not this trip for sure!"

"Talia and I are traveling to Singapore tomorrow and will likely find time before or after flying......to speak with you. I hope that you do not mind a call at an odd hour. I know that you are most anxious to proceed on a "hands-on" basis."

51. On or about October 17, 2006 Defendant T. Braich wrote, in an email which was

forwarded to Plaintiffs by Defendant E. Braich, as follows:

"My father believes strongly in the capabilities of our team and does not want to fail in making your investment extremely valuable in short order. Needless to say, he has a lot on his plate, which was further compounded by many of the small and large (but equally important) events that you are now aware of. He is entrusting that you will take great care in not missing or forgetting any single item. As of course, you know, things sometimes have an intertwined or domino effect. I realize that some details will not be entirely accurate, however, the mere fact that everything is itemized by you will play a valuable role which will greatly benefit everyone. By this, I refer to not only Jack and Marian, the Menda family, but all of our current and future employees, customers and last, but not least, the deserving people in the DRC."

52. On or about October 18, 2006 Defendant E. Braich wrote to Defendant Nekrasoff and

Plaintiffs as follows:

> "As discussed, due to the relatively very high amounts suggested to be charged by
> the government in the Democratic Republic of Congo for new export and
> purchase licenses, I need to discuss this situation with Roger and Punit. This cost
> increase for future contracts was not expected by us....so quickly. The overall
> attention to things on the ground by new interested parties—globally—is quite
> incredible and much sooner than anticipated!"

> "We need to find a solution. I have great faith in Punit's abilities and the role that
> he and his family will play for L/C's etc. More importantly, Punit's management
> skills will be solidified and he will gain excellent experience in this business. Not
> to mention the potential profits and contacts. We need this help, as you know,
> with so much on my plate, at present."

> "But, it is clear that for US $450 thousand (over time) that my kids have sold 10%
> of only the first contract with the DRC (600,000 mt) in Taler. Now that we are to
> be issued more contracts; and to avoid forming new entities for Erwin Jr. and
> Talia to replace Taler Resources Incorporated.....I need to discuss a solution to
> this important item with Roger and Punit."

> "They are very reasonable people and I am sure that we will come to a suitable
> arrangement quite quickly. Punit is going to be traveling to Africa with me in the
> next two weeks. I have told Nito and I would like to have Nito back in the DRC
> when I meet with the President elect. Nito is flying to
> Frankfurt/Toronto/Vancouver tomorrow to deal with the emergency in Canada re:
> his son."

53. On or about October 24, 2006 Defendant Nekrasoff wrote to Plaintiffs as follows:

> "I am writing this e-mail to you to clarify some outstanding issues.
> We need clarification prior to moving forward and to straighten out what appears
> to be a simple clerical error.

> I have been extremely busy working on other projects and I apologize for not
> writing sooner. It is my understanding that we gave you and your family a
> discounted price to get involved with us, as there are some mutual benefits of us
> doing business together. We want to take a long term view of this relationship
> and what you and your family bring to the table in energy, karma, expertise with
> Letter's of Credit, etc. For us the money is secondary.

> I know you appreciate that the overall value of the Department of National
> Defense Contract/Agreement at a very conservative and minimum value using a
> profit level of US$100/metric tonne would be US$60,000,000. When you take

into consideration that there is quite a bit of non-ferrous scrap included in this Contract/Agreement the value of this Contract/Agreement is substantially higher than US $60,000,000.

In the Agreement Dated August 29, 2006, it clearly states that the Menda Family will invest US$450,000 for 10% of the outstanding and issued shares of Taler Resources Incorporated. However, it has always been my understanding that for the investment of US$450,000 the Menda Family would receive 10% of the Department of National Defence Contract/Agreement."

I believe that this was a simple error that was done in haste, and was never the intention of either party.

Additionally, you should know that there are ongoing discussions with Erwin Braich to arrange the sale of the 10% (and quite conceivably a larger percentage), of 'Taler' for much more than US$450,000 (pro-rata). If this transpires, the Mendas Family could be repaid, (based upon the investment made to date), as per the Agreement dated August 29, 2006. Accordingly, the Mendas Family would receive a fair profit/return for their short term investment should this transpire, however, this will all be discussed with you and your family when Erwin returns to New York in the next couple of days.

Also, it is my understanding that there is a further US$75,000 due from the Menda Family, (as per the Agreement dated August 29, 2006), on or before October 25, 2006 and I am not sure at this point, whether this has been a topic of conversation yet.

I trust that this matter can be resolved to the satisfaction of everyone, so that we can move forward.

I am willing and have always been willing to assign 10% of the Department of National Defence Contract/Agreement over to the Menda Family.

Best regards,

Taler Resources Incorporated

per: James Nekrasoff

President and Managing Director"

54. On or about October 26, 2006 Defendant E. Braich wrote to Plaintiffs as follows:

"Your Dad needs to be comfortable, in order to finalize this deal. For this to happen.......I will come to your office (if it suits both your schedules) at about eleven o'clock. Please leave me a voicemail message as I may be sleeping or

already in a meeting with the attorney that I mentioned to you. We moved the Saturday meeting up to today. We may finish matters today and not have to meet again on this trip. In that case I would be glad to meet with your advisors on Friday, again only if it suits you and them."

"I want your Dad to be very happy. Deals like this only come around once in a long time and I want you to benefit greatly on many levels. I am writing with my heartfelt feelings!"

55. On or about October 26, 2006 Defendant E. Braich wrote to Plaintiffs as follows:

"Dear Punit:

When we meet next please ask me to:

1) Show you pictures of the remainder (13-14 thousand mt) of the bagged Urea shipload (25 thousand mt) from the Middle East that I visited in our customer's warehouse in Ho Chi Minh City. We spoke about this extra load/favour (sic) that they asked me for some time ago; I don't know if you remember?

2) Tell you and your Dad exactly how I know the guys from First Quantum Minerals Ltd. They (First Quartum from Vancouver) and Kumba Resources Ltd. (from South Africa) recently won in a Belgium courtroom re: the rights to the Kipushi mine in Democratic Republic of Congo. I will tell you re: ex Prime Minister Joe Clark's role with First Quantum! Cheers, Erwin"

56. On or about November 1, 2006 Defendant E. Braich wrote to Plaintiffs as follows:

"From: 'Erwin Braich' erwinbraich@hotmail.com
To: satinderdhillon2004@yahoo.ca
CC: Donald_57@ssdg.net, jackmorrison123@aol.com
Subject: FW: Check out Kahala Beach Front Vacation Apartment/Kahala Beach Front Vacation
Date: Tue, 31 Oct 2006 20:28:23-0800

Dear Satinder:

Please call the realtor immediately and negotiate to buy the residence on behalf of Jack and Marian. We will discuss the entity that will buy it......as it still needs to be formed. This will give Marian a nice gift for Christmas from Jack!

One of our companies can hold the payment-free mortgage at a nominal interest rate (for tax purposes...to demonstrate arms length)until we are loading cargo from the DRC and then Jack (after proper income tax planning) can pay it off!

Cheers,

Erwin"

57. On or about November 1, 2006 Defendant E. Braich wrote to Plaintiffs and Defendants

Dhillon and Nekrasoff as follows:

"Dear Punit,

I agree with Satinder re: the preliminary results. It is 5:23 am and I am still back and forth with e-mails! I have been catching up on e-mails for nine hours. This must change soon!

Jack will be in great shape in the DRC if we wire via WESTERN UNION another $9-10,000 to him today. I will likely be sleeping but will leave Talia a note to send this. Of course, only if you can fund this with comfort and confidence. She depleted yesterday's transfer already.

Would it be possible for you or your Dad to wire this to her account in the Bank of America? If it were not important I would not request this....some things just can not wait until next week (in the DRC). If you are able please call her or leave her a voicemail if she doesn't answer at 360 961 1088.

By the way...I was very pleased that your Dad was so forthright with his 3 concerns; when we had lunch. I wish he would have told me earlier! I a very happy that this is a great transaction for you...individually...and NRM Holdings for the upcoming L/C business!

I will inform you the day after tomorrow if I have secured the first shipments of lower priced rice for Liberia. I should have some answers tomorrow during the night."

58. On or about November 5, 2006 Defendant E. Braich wrote to Plaintiffs and Defendant

Nekrasoff to inform them as follows:

"Punit and Roger,

This is the latest for your info. I have spoken to Jim Nekrasoff and we are working on switching 90% of the total shares of Taler Resources Incorporated into the name of a Trust for my two children. This is easily done. I have explained to Jim that I would like you (Roger) to act as a co-trustee of this Trust (for my kids) with a couple of others.....Jim and Bill. The other 10% would be directly owned by Punit's new LLC. We will see what Punit, Burt Laskin, and Jim, come up with as an efficient and bankable, yet clean and simple entity for trading scrap from the Democratic Republic of Congo.

I will possible be going to Antigua with Jim to meet Arthur Thomas and set up the new Trust offshore. There is other business that I need to attend to.

It is my desire to have you consider funding Punit on "buying into" 10% of all future contracts as well. This would be over and above the first contract for 600,000 mt. I badly need to divest and delegate responsibility to Punit and others that he may hire.

There are other strong parties wanting a portion of this venture coupled with right of first refusal for HMS 1&2 and other alloys, and scrap. They are offering a lot of money but Punit and I do not want sell yet.

I now have another antibiotic which I just bought from Walgreen's and I also bough the Emergen-C pouches which you recommended.

When I speak to Jim, as I promised, I will ask him to contact Arthur's office in Antiqua and deal appropriately with these "bearer" shares; as he holds these in some lock box or safety box in trust for Erwin Jr. and Talia. He needs about three days to book a flight to New York.

I will return to New York to be with all of you for meetings on many issues re: Liberia; when and if Talia is happy with matters in Arizona or New Mexico. Sorry, that we could not make it for lunch today; but as you know I am very much in need of rest.

However it was very important to forward this and other e-mails to you and Punit. Punit will not be able to leave around November 10th due to meetings in New York. This info was e-mailed to me as he arrived in California. We were not planning to leave until a few days later; so his meetings have no impact on our plan.

I just now received a call from Jack (from Khinshasa) and he suggested that we stay is South Africa/Mozambique until the run-off election results are announced. That is when things may get violent in a few pockets. Who can guess?

I have told everyone that you are prepared to wire transfer the remaining $forty thousand of the second tranhce ($150,000) pursuant to the outline of the deal as signed by Satinder. Perhaps the first load, cut and sorted scrap at the Port of Matadi, Letter(s) of Credit will obviate and nullify your need to make the third advance around Christmas. Let's hope so. The guys in the DRC think so! Jack just confirmed this once again. He needs this to happen…for the condo on the beach in Honolulu….as a gift for Marian (his wife)!

As soon as you have done this transfer of $40,000 to Talia at The Bank of America in New York please advise and I will see that the proper promissory

notes be delivered to you asap (for your protection). This would be before Talia leaves for the southwest.

Talia will have prepared and duly signed the promissory note under the same terms and conditions as Satinder had executed re: the first $150,000. She will not get UPS to courier it to you! It will be delivered in your office or home personally!

On Punit's return, I may still be in New York, as I should not fly in this unhealthy condition.

I have not yet read any of Mr. Bob Miller's research, as there is so much written about my family and I, over the years, as explained to you; but eventually I will.

We'll talk soon

Cheers, Erwin"

59. On or about November 7, 2006 Defendant E. Braich wrote to Plaintiffs and Defendant

Nekrasoff as follows:

"Punit:

For your information; no action needed; as you will be the one....eventually handling all of this stuff soon! She probably is not someone that we want to waste our time with....although we did loan her money for her son's private school tuition! I felt sorry for her and.....

I am not well enough to have a long meeting with the guys and you today re: bottled water for Liberia and surrounding countries. I am trying to reach Mark and Ramsey to cancel.

Talia will be delivering a duly endorsed promissory note ($150,000) pursuant to the original deal to your office asap. Now, to be clear, the whole of the second tranche has been paid as directed, for the 600,000 mt scrap contract.

Thank you. Probably see you tomorrow. Erwin"

60. On or about November 7, 2006 Defendant E. Braich wrote to Plaintiffs and Defendant

Nekrasoff as follows:

"From: Jackmorrison123@aol.com
To: erwinbraich@hotmail.com
Subject: Vehicles Date: Mon, 6 Nov 2006 10:21:15 EST

Erwin, I have contacted my nephew in Orlando to look at vehicles. He has a construction site cleaning service and has a half a dozen Bobcats and a few frontend loaders. He said he can get anything we need as there is a huge used market in Florida. It is also a whole lot easier to ship from Florida than it is from B.C. I will call Nito in an hour and catch him up on what's going on.

Jack"

61. On or about November 28, 2006 Defendant E. Braich wrote to Plaintiffs as follows:

"Dear Roger and Punit:

For your information only. No action required. As I told Punit; their price is too low. They are several million dollars below current market for fifty (50) loads. As you can see I told them this. I also stated that we did not want or need USD $6,400,000 up front deposit that they are offering. This morning, after we (Roger and I) spoke, they increased their price to USD$175/mt FOB Matadi for two (2) loads to be delivered in Dember [sic]/January/ I don't think they will match the other five potential buyers' prices and terms.
Punit, we have much time to discuss this item. I told them that we would be

inAfrica in mid-December. They want to meet us there.

Cheers, Erwin."

62. On or about December 5, 2006 Defendant E. Braich wrote to Plaintiffs and copies

Defendants Dhillon and Nekrasoff as follows:

"Dear Punit,

I am going to go to sleep very late again. Please thank your Dad for allowing you to wire this forty thousand (to one of my attorneys) as directed. Kindly please do this as early in the day (Tuesday) as possible for you. Attached is the co-ordinate for Mr. Berry's Trust account. This now will aggregate $340 thousand that has been wired.

Let's set a time of between 4 and 6 pm (Tuesday-Phoenix local) to try and talk with Joey on a conference call. Hopefully he will not have flown out from Philadelphia or NYC by then. Please leave me a voicemail as to when both of you are available.

If you speak with him please ask for the specs of the rice required for the first 2 X 12,500 mt; as we discussed today. We may then scan some exact quotations for

26

him to present in Monrovia; along with general letters of interest to him for his presentation.

If he has left we can receive this info after he reaches Liberia. The conference call can then be made on Wednesday.

It has been confirmed to all others involved that you will not need to make the payment of the balance of $110,000, which would then complete the loans/investment of a total of $450,000, until we have discussed this and reached agreement again; and certainly after the end of December, 2006.

I appreciate the fact (and have told the others) that you will be able to work on the offshore income tax planning, in Taler Resources Incorporated, for the 10% of our first contract (in the amount of 600,000 mt). Perhaps Mr. Laskin gave you some further insight into this matter today.

We will review all matters relating to the domicile of your family's company and/or Trust and the potential "transfer pricing" before and after our upcoming trip to South Africa, the Domocratic Republic of Congo, and Liberia. It is possible that we may need to visit London as Ballisteel, and another potential customer, are headquartered there.

We will try and free you to return to New York before Christmas, but after today's very positive events, it appears that your Dad is wise when he says that you should be with us throughout the whole trip (even past Dec. 25) re: scrap steel and the Liberian opportunities that we will explore based on Joey's connections.

I will explain when we speak the reason that Jeff (the CEO) of Ballisteel from Houston; did not call your office today. He will call when he is here on Thursday.

There is a company from J'berg, heavily involved in South Africa and Mozambique, who own controlling interest in two mid-size banks, and are significant rough diamond traders. Apparently they are presently cutting scrap in Mozambique, and are stating that they will pay Taler the highest price of any potential customer for our first three loads. All of their material is stuffed into containers.

They ironically contacted us today (after we spoke this morning) and their attorney is already drafting a contract for 3 loads.....FOB Matadi Port to be delivered before January 31, 2007. I have been promised that by Wednesday the contract draft will be e-mailed to me. I would appreciate your thoughts on the language when I forward it to you. By the way, they are willing to put one million dollars in escrow towards the first two loads (in their attorney's Trust account).....($500,000/load). They are familiar with our material as it relates to HMS 1&2 in the DRC as they have seen the material and were trying to locate the "owners" since last week! Cheers, Erwin"

63. On or about January 12, 2007 Defendant Nekrasoff wrote to, Plaintiffs and Defendant E.

Braich as follows:

"Dear Mr. Menda,

We have not yet met personally but, Erwin has told me a great deal about you and your son Punit.

There is a sense of satisfaction and comfort knowing that at this stage of accomplishment within our Group that we are going to be moving forward with you and Punit working together. In particular, within the trading division, this will be a valuable opportunity for Punit. You are aware of our extensive networking ability throughout the world; this will obviously enhance his connections worldwide. Erwin advises that has confidence in your ability in facilitating letters of credit.

I realize that due to individual needs, and personal issues, (Erwin's brother's health), that travel plans have been delayed. However, I am quite anxious to meet with Erwin and Punit and various governmental officials to move these projects forward.

I have learned of a telephone conversation that Satinder Dhillon had with you and I understand your sensitivity as the Senior family member that you felt somewhat offended that he was calling you. You may recall that it was Satinder who signed the original Agreement with your family on August 29, 2006 in New York. In this regard, it is my understanding that as he was the one who signed the Agreement he felt that it was within his rights to communicate directly with you. I understand that this is not very important at this stage.

I am prepared to leave Slovenia next week and I may need to travel to Moscow however, the main purpose of the first part of this trip may be to sign appropriate resolutions for the issuance of a share certificate for 100 shares which represents 10% of the issued shares in the name of Taler Resources Incorporated which in turn represents 10% of the first contract with the Department of National Defence for 600,000 metric tones of scrap metal. However, before this can be done we need to clarify when your final payment of US $110,000 is forthcoming. You will recall that in the Agreement that Satinder signed on August 29, 2006 that the final payment by your family in this Agreement was due on or before December 23, 2006. You may also recall that there is an option in this Agreement that we can repay your investment at anytime should all of the agreed upon investment of US $450,000 not be received.

Accordingly and as I see it; there are two questions that need to be answered;

28

1. Do you wish to proceed with your investment with us?
2. If #1 yes then, what name/entity is the share certificate to be issued? (I know that Erwin and Punit have had initial discussions in this regard already).

Erwin has previously advised me that you may not have the required capital available based upon a message that he received from Punit around New Year, regarding US$10,000 that Erwin suggested and politely requested be deposited into Talia's account in the Bank of America in New York. If the balance of US$110,000 is problematical for you; should we then be looking at establishing an alternative plan? Erwin does not believe that it is problem based upon his last discussion with you.

It is encouraging for me to know that you merely need assurance from me that you will receive the aforementioned share certificate from Antigua. In this regard, if payment is forthcoming (as agreed between the Parties), on acceptable terms and timing; I then assure you that I will travel to Antigua immediately.

I am fully prepared to immediately travel to Antigua and then to New York to meet you and to personally deliver the share certificate prior to flying to Africa. This will also allow for Erwin, Punit you and I am opportunity to do some strategic planning. I am fully aware of the situation in Liberia.

Best regards,
Taler Resources Incorporated
Per; James Nekrasoff
President and Managing Director"

64. The statements referenced about in ¶¶41-68 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were then known to each of the Individual Defendants or recklessly disregarded by them:

a)    The Individual Defendants were not engaged in numerous commodities trading transactions; and

b)    The Individual Defendants did not intend to enter the commodities trading business with Plaintiffs; and

c)    On September 2, 2006, Defendants had not "sold 40,000 m/t of Taler's scrap" to a "Turkish party"; and

d)    The Individual Defendants had no intention of creating a new business entity in New York to be operated, staffed and managed by Plaintiffs; and

e)    The Individual Defendants had no intention of giving Plaintiffs 50% of the voting shares of a new business entity to be formed in New York; and

f)    The Individual Defendants knew that Plaintiffs' Investment in Taler would not lead to millions of dollars in profits for Plaintiffs on the DRC Contract and a partnership between Plaintiffs and Defendants in Defendants' Business; and

g)    The Individual Defendants knew that a material portion of Plaintiffs' Investment was not being invested in Taler's business or in the expenditures necessary to perform the DRC Contract; and

h)    The Individual Defendants knew that third party buyers were not already committed to purchase scrap metal obtained through the DRC Contract; and

i)    The Individual Defendants did not intend to refund Plaintiffs' Investment upon Plaintiffs' request; and

j)    The third party offers for scrap metal through the DRC Contract described in the foregoing correspondence did not exist or were not serious or firm offers; and

k)    The Individual Defendants knew that Defendants had not begun to cut, sort, prepare or load scrap metal for shipment, did not have the equipment to cut, sort, load or prepare to ship the scrap metal, and were not ready to ship or deliver for shipment the scrap metal on the DRC Contract in September, October or November 2006; and

30

l)    The Individual Defendants knew or had reason to know that Defendant E. Braich did not possess to personal assets he claimed to Plaintiffs to possess;

m)    Each of the foregoing representations was made soley in order for the Individual Defendants to obtain a material portion of Plaintiffs' Investment solely for their personal use; and

65.    Each of the foregoing statements was a material misrepresentation made by or with the knowledge of each of the Individual Defendants.

66.    Each of the Individual Defendants had a duty to speak truthfully in the statements made to Plaintiffs by the Individual Defendants, and/or the statements made with the Individual Defendants' knowledge and each of the Individual Defendants had a duty to disclose that the material facts had been misrepresented to Plaintiffs as more particularly set forth herein.

67.    Each of the Individual Defendants was an insider and controlling person who participated in the misrepresentation of material facts to Plaintiffs, upon which the sale of Defendant Taler's securities to Plaintiffs was based as more particularly set forth herein.

68.    Plaintiffs, in making Plaintiffs' Investment, relied up the misrepresentation of material facts by the Individual Defendants as more particularly set forth herein.

**FIRST COUNT**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the Individual Defendants)**

69.    Plaintiffs repeat and reallege each the paragraphs above as if set forth in full herein.

70.    This cause of action is asserted against the Individual Defendants, jointly and severally, for violation of Section 10 (b) of the 1934 Act, 15 USC §78j(b), and Rule 10b-5, 17 CFR § 240.10b-5, promulgated thereunder.

71.  The Individual Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state facts necessary in order to make the statements made about Taler and the DRC Contract not misleading.

72.  The Individual Defendants, as directors, officers and employees of Taler, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers, employees, and directors of Taler and its subsidiaries, the Individual Defendants were able to and did control the content of the statements and information disseminated to Plaintiffs.  With knowledge of the falisity and misleading nature of the statements contained therein and in reckless disregard of the truth as pertains to those statements, the Individual Defendants caused the material misstatements and omissions of material facts as alleged herein.

73.  The misrepresentations and omissions of the Individual Defendants were intentional and reckless and done for the purposes of enriching themselves, concealing Taler's true operating and financial condition from Plaintiffs, and inducing Plaintiffs to make Plaintiffs' Investment.

74.  The Individual Defendants aided and abetted one another to prepare, promote, and disseminate materially false and misleading statements and information to Plaintiffs.

75.  The Individual Defendants acted with scienter, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

76. Plaintiffs are informed and believe, and on that basis aver, that the Individual Defendants, at all times relevant herein, knew that the Individual Defendants did not intend to fulfill Taler's obligations under the DRC Contract.

77. The Individual Defendants deliberately orchestrated a sham transaction with Plaintiffs as a means to illegally solicit Plaintiffs' Investment from Plaintiffs. Each of the Individual Defendants knew that the purpose of Individual Defendants' offer to sell securities in Taler and an interest in the DRC Contract to Plaintiffs was to obtain Plaintiffs' Investment for Defendants personal use.

78. The Individual Defendants' materially false and misleading statements were made with the intent to deceive, manipulate or defraud the Plaintiffs. More particularly, at the time these statements were made, the Individual Defendants knew they did not intend to conduct business through Taler, that they did not intend to fulfill Taler's obligations under or to complete the DRC Contracts and that they did not intend to form or fund the formation of a New York Company to conduct a commodities trading business.

79. The Individual Defendants further knew and understood that they did not intend to carry out the DRC Contract, and that the Individual Defendants' false and misleading statements to Plaintiffs as aforesaid were made for the sole purpose of inducing Plaintiffs to make Plaintiffs Investment so as to enable each of the Individual Defendants to misappropriate Plaintiffs' Investment for their personal use.

80. These materially false and misleading statements were made by the Individual Defendants solely to induce Plaintiffs to enter into the Agreements for the offer and sale of securities in Taler.

81. Plaintiffs specifically relied upon the Individual Defendants' intentionally false and misleading verbal and written statements, as more fully set forth in the Defendants' Written Solicitation regarding Taler and the sale and profitability of the scrap metal business.

82. As a direct result of Plaintiffs' reliance on Defendants' false and misleading statements, the Individual Defendants' induced Plaintiffs to invest $340,000.00.

83. The Individual Defendants, acting individually and in concert, in connection with the purchase and sale of securities in Taler, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, have employed or are employing devices, schemes and artifices to defraud; have made untrue statements of material fact directed to Plaintiffs in this Judicial District and have failed to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged in acts, practices and courses of business which have operated or would operate as a fraud and deceit upon Plaintiffs.

84. The Individual Defendants knew or were reckless in not knowing of the activities described above.

85. The Individual Defendants have thus acted in violation of Section 10 (b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5.

86. In the alternative, by reason of the foregoing, the Taler, Nekrasoff and T. Braich have aided and abetted in E. Braich's and Dhillon's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a), (b) and (c) promulgated thereunder [17 C.F.R. §240.10b-5].

**WHEREFORE**, Plaintiffs respectfully request a Judgment:

a. Ordering Defendants to disgorge any ill-gotten gains from the conduct alleged herein and to pay prejudgment interest thereon,

b. Ordering Defendants to return the monies paid by Plaintiffs and pay over any and all gains realized by Defendants as a result of the conduct alleged herein.

c. Ordering Defendants to pay civil money penalties.

d. Ordering Defendants to pay to Plaintiffs the difference between the monies Plaintiffs paid to Defendants and value received by Plaintiffs.

e. Attorneys fees and costs.

f. For such other and further relief as the Court deems proper, together with the costs and disbursements of this action.

## SECOND COUNT
### Violations of Section 20(a) of the Exchange Act by the Individual Defendants

87. Plaintiffs repeat and reallege each the paragraphs above as if set forth in full herein.

88. The Individual Defendants, by virtue of their positions within Taler and Defendants' Business, their stock ownership, and their specific acts as described herein were, at the time of the wrongs alleged herein, controlling persons of Taler with in the meaning of Section 20(a) of the Exchange Act.

89. The Individual Defendants had the power, influence, and authority to direct or cause the direction of the management and policies of Taler and Defendants' Business and, therefore, to cause or to prevent the wrongful conduct and practices complained of herein, and in fact, directed and caused, in whole or in material part, such management and policies of Taler and Defendants' Busienss, so as to cause, and to fail to prevent, the wrongful conduct alleged herein.

90. As a direct and proximate cause of the Individual Defendants' wrongful conduct, Plaintiffs were damaged in connection with their purchase of Taler securities.

91. By reason of the conduct alleged herein, the Individual Defendants are liable jointly and severally for the wrongful conduct alleged herein, and are liable to Plaintiffs for the substantial damages which they suffered in connection with its purchases of Taler securities.

**WHEREFORE,** Plaintiffs respectfully request a Judgment:

a) Ordering Defendants to disgorge any ill-gotten gains from the conduct alleged herein and to pay prejudgment interest thereon,

b) Ordering Defendants to return the monies paid by Plaintiffs and pay over any and all gains realized by Defendants as a result of the conduct alleged herein.

c) Ordering Defendants to pay civil money penalties.

d) Ordering Defendants to pay to Plaintiffs the difference between the monies Plaintiffs paid to Defendants and value received by Plaintiffs.

e) Attorneys fees and costs.

f) For such other and further relief as the Court deems proper, together with the costs and disbursements of this action.

## THIRD COUNT
### (Violations of a Dealer Under 15 U.S.C.S. §78o)
### Against Defendants E. Braich, T. Braich Dhillon and Nekrasoff

92. Plaintiffs repeat and reallege each the paragraphs above as if set forth in full herein.

93. Plaintiffs are informed, and on that basis aver, that Defendants E.Braich, T. Braich, Dhillon and Nekrasoff failed to disclose the true nature of the Defendants conduct as alleged herein, and further failed to disclose to Plaintiffs that they were the paid agents of Nekrasoff and Taler, and were to receive compensation from them for their services in soliciting Plaintiffs.

94. Defendants E. Braich, T. Braich, Dhillon and Nekrasoff, by making materially false and misleading statements to induce Plaintiffs' to make Plaintiffs' Investment in Defendants' Business and the DRC Contract as an account of another, acted as  dealers pursuant to 15 U.S.C.S. §78o(a)(1).

95. Plaintiffs are informed, and on that basis aver, that defendants E. Braich, T. Braich and Dhillon were not registered brokers with the Securities and Exchange Commission.

96. E. Braich, T. Braich, Dhillon and Nekrasoff engaged in the business of soliciting and effecting the Plaintiffs' Investment in Taler and the DRC Contract and Defendant Dhillon to execute Defendants' Written Solicitation, and engaged in securities transactions, which were accounts of another, namely Taler, and Defendants' Business.

97. As more fully set forth above, E. Braich, T. Braich, Dhillon and Nekrasoff solicited Plaintiffs' Investment by phone, written correspondence, email and in person.  E. Braich, T. Braich, Dhillon and Nekrasoff further distributed documents and actively sought to effect the above securities transactions which were memorialized in their correspondence to Plaintiffs and in the Defendants' Written Solicitation.

**WHEREFORE**, Plaintiffs demand a final judgment:

    a.  Disgorging E. Braich, T. Braich, Dhillon and Nekrasoff of their ill-gotten gains received by or as a result of Plaintiffs' Investment in Taler Defendants' Business and the DRC Contract.

    b.  Civil Penalties pursuant to 15 U.S.C. §78u(d)(3);

    c.  Attorneys fees and the costs of this action, and

    d.  For any other such relief as the Court deems appropriate.

## FOURTH COUNT
### (Fraud Against E. Braich, T. Braich, Dhillon and Nekrasoff)

98.    Plaintiffs repeat and reallege each of the paragraphs above as if set forth in full herein.

99.    During the course of their negotiations, in order to induce Plaintiffs to made Plaintiffs' Investment, the Individual Defendants represented to Plaintiffs that Defendants would apply Plaintiffs' Investment to the business of Taler and the DRC Contract.

100.    During the negotiations, the Individual Defendants each represented to Plaintiffs that scrap metal acquired through the DRC Contract had already been sold for a high profit and that Plaintiffs' Investment would be utilized to fund a business established in New York to engage in international commodities trading which would be owned by Plaintiffs and Defendants and staffed by Plaintiffs. The Individual Defendants were aware that the foregoing representations among others, were considered by Plaintiffs to be the most essential and valuable assets of the transaction, and the price negotiated was predicated upon this belief.

101.    Plaintiffs are informed and believe, and on that basis aver, that the Individual Defendants knowingly, willfully and specifically withheld from Plaintiffs material facts, such as that Defendants had no intention of completing the DRC Contract or applying Plaintiffs' Investment to Taler or the DRC Contract.

102.    Plaintiffs are informed and believe, and on that basis aver, each of the Individual Defendants participated in a scheme to defraud the Plaintiffs by making materially false, fraudulent and misleading representations concerning the Defendants' Written Solicitation, the Defendants' Business and the DRC Contract, and Plaintiffs' entitlements based thereupon, and by intentionally misappropriating Plaintiffs' Investment for their personal use.

103. Plaintiffs are informed and believe, and on that basis aver, as part of this scheme, each of the Individual Defendants acted in bad faith and with actual intent to defraud the Plaintiffs.

104. Plaintiffs are informed and believe, and on that basis aver, each of the Individual Defendants knew of the misrepresentations and omissions set forth in this Complaint with respect to the Defendants Agreement, the Defendants' Business and the DRC Contract.

105. As a result of these false, fraudulent and misleading misrepresentations and omissions of material facts, Plaintiffs paid substantial consideration for assets which Plaintiffs never received.

106. Such acts of the Individual Defendants constitute fraud and deceit.

107. Plaintiffs relied upon the representations made by the Individual Defendants, and would not have made Plaintiffs' Investment except for Plaintiffs reliance to Plaintiffs detriment on those representations.

**WHEREFORE,** Plaintiffs have been damaged in an amount yet to be determined at trial, but in no event less than $340,000.00 plus interest from the date of Plaintiffs' Investment, plus any and all profits and gains earned by the Defendants as a result of their conduct complained of herein.

### FIFTH COUNT
### (Breach of Fiduciary Duty
### Against Nekrasoff, E. Braich, T. Braich and Dhillon)

108. Plaintiffs repeat and reallege each of the paragraphs above as if set forth in full herein.

109. The Individual Defendants, as the sole shareholders insiders and controlling persons of Taler, owed a fiduciary duty to Taler and Plaintiffs.

110. The Individual Defendants' conduct as aforesaid was performed in violation of their fiduciary duties to Taler and Plaintiffs.

**WHEREFORE,** Plaintiffs demand judgment against the Individual Defendants as follows:

a.  Enjoining the Individual Defendants from transferring, disposing of, selling, encumbering or hypothecating any accounts, inventory, leases, equipment, real estate or other assets of Taler without the consent of all shareholders;

b.  Directing that Defendants turn over all books and records relating to all of the Individual Defendants' bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets to the extent same reflect Plaintiffs' Investment or the profits or property derived therefrom;

c.  Providing an accounting of all the Taler's bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets;

d.  Awarding compensatory damages, including prejudgment interest;

e.  Awarding punitive damages;

f.  Awarding attorney fees and cost of suit; and

g.  Awarding such other and further relief as the Court may deem just, equitable and proper.

## SIXTH COUNT

### (Breach of the Covenant of Good Faith and Fair Dealing Against Defendants E. Braich, T. Braich, Dhillon and Nekrasoff)

111.  Plaintiffs repeat and reallege each of the paragraphs above as if set forth in full herein.

112.  The Individual Defendants' conduct was performed in violation of Defendants' duty of good faith and fair dealing.

**WHEREFORE,** Plaintiffs have been damaged, and respectfully request a final judgment:

a. Enjoining the Individual Defendants from transferring, disposing of, selling, encumbering or hypothecating any accounts, inventory, leases, equipment, real estate or other assets of the individual Defendants to the extent same reflect Plaintiffs' Investment in Taler, Defendants' Business and/or the DRC Contract;

b. Directing that Defendants turn over all books and records relating to all of the Individual Defendants' bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets to the extent same reflect Plaintiffs' Investment or the profits or property derived therefrom;

c. Providing an accounting of all the Taler's bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets;

d. Awarding compensatory damages, including prejudgment interest;

e. Awarding punitive damages;

f. Awarding attorney fees and cost of suit; and

g. Awarding such other and further relief as the Court may deem just, equitable and proper.

## SEVENTH COUNT
### (Unjust Enrichment Against Defendants E. Braich, T. Braich, Dhillon and Nekrasoff)

113. Plaintiffs repeat and reallege each of the paragraphs above as if set forth in full herein.

114. The Individual Defendants have misappropriated Plaintiffs' Investment and have withdrawn or caused to be withdrawn funds and assets from Plaintiffs' Investment without the proper authorization.

115. The Individual Defendants have retained the benefit of those funds for their own financial gain.

116. The Individual Defendants have not provided any pecuniary benefit to Plaintiffs for the funds or assets that they have taken or caused to be taken from the Taler and the Plaintiffs.

117. Defendants' unjust enrichment has caused Plaintiffs injury.

**WHEREFORE,** Plaintiffs demand judgment against the Individual Defendants as follows:

a. Enjoining Defendants from transferring, disposing of, selling, encumbering or hypothecating any accounts, inventory, leases, equipment, real estate or other assets of the Individual Defendants without the consent of all shareholders;

b. Directing that the Individual Defendants turn over all books and records relating to all of the Individual Defendants' bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets to the extent same reflect Plaintiffs' Investment or the profits or property derived therefrom;

c. Providing an accounting of all Taler's bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets;

d. Awarding compensatory damages, including prejudgment interest;

e. Awarding punitive damages;

f. Awarding attorney fees and cost of suit; and

g. Awarding such other and further relief as the Court may deem just, equitable and proper.

## EIGHTH COUNT
### (Breach of Contract Against All Defendants)

118.  Plaintiffs repeat and reallege each of the paragraphs above as if set forth in full herein.

119.  Plaintiffs are informed and believe, and on that basis aver, that at all times herein mentioned, each of the Defendants sued herein was the agent and employee of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency and employment.

120.  Plaintiffs paid to Defendants and their agents $340,000.00 consideration pursuant to the Defendants' Written Solicitation.

121.  Plaintiffs have performed all conditions, covenants, and promises required of Plaintiffs to be performed in accordance with the terms and conditions of the Defendants' Written Solicitation.

122.  As a result of Defendants aforementioned conduct, which is set for more particularly above, and which is incorporated herein by this reference, the Defendants breached the said Defendants' Written Solicitation.

123.  By reason of Defendants' breach of said Defendants' Written Solicitation as herein alleged, Plaintiffs have suffered damages in an amount to be determined at trial, but in any event no less than $340,000.00 prejudgment interest thereon.

124.  By the terms of said written Defendants' Written Solicitation, the Plaintiffs are entitled to recover reasonable attorney fees incurred in the enforcement of the provisions of the agreement. By reason of Defendants' aforementioned breach, the Plaintiff has been forced to secure the services attorneys to prosecute this lawsuit.

**WHEREFORE**, Plaintiffs pray judgment against Defendants and each of them, as follows:

    a.   For compensatory damages in the sum of $340,000.00.

    b.   For interest from and after delivery of Plaintiffs' Investment to the date of judgment;

    c.   For reasonable attorney fees according to proof;

    d.   For costs of suit herein incurred; and

    e.   For such other and further relief as the court may deem proper.

## NINTH COUNT
### (Constructive Trust and Accounting against All Defendants)

125.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

126.  The Individual Defendants are fiduciaries of Plaintiffs.

127.  The Individual Defendants engaged in a scheme to defraud Plaintiffs which involved materially false and misleading statements and omissions regarding the true nature and status of Taler's business, Defendants' Business, the DRC Contract and the distributive share to be paid to Plaintiffs, and the capital and other requirements of Taler and the DRC Contract.

128.  Plaintiffs are informed and believe, and on that basis aver, that the Individual Defendants' misappropriation of Plaintiffs' Investment was unlawful and designed to deceive Plaintiffs and was intended to wrongfully enrich Individual Defendants at the expense and loss of Plaintiffs.

129.  Plaintiffs reasonably relied on the Individual Defendants' misstatements and omissions and that reasonable reliance actually and proximately harmed Plaintiffs by causing the loss of Taler's business and the DRC Contract.

130. The Individual Defendants' distribution of Taler's assets was fraudulent and breached the Individual Defendants' fiduciary duties to Plaintiffs and Taler, and as such those transfers are void *ab initio*.

131. By reason of the foregoing, to the extent the Individual Defendants have exercised any rights or secured any benefits based on the foregoing including, but not limited to, the Plaintiffs' investment, the Individual Defendants hold such benefits and interests pursuant to a constructive trust, as *cestui que trust*, for the benefit of, and subject to the rights, entitlements, and interests of Plaintiffs and Taler.

WHEREFORE, the Plaintiffs respectfully pray for relief requested against the Defendants as follows: a constructive trust over Plaintiffs' Investment and any profits, and/or proceeds derived from Plaintiffs' Investment as misappropriated by the Individual Defendants.

## TENTH COUNT
### (Embezzlement Against Defendants E. Braich, T. Braich, Dhillon and Nekrasoff)

132. Plaintiffs repeat and reallege each of the paragraphs above as if set forth in full herein.

133. The Individual Defendants have withdrawn or caused to be withdrawn funds and assets, that were lawfully within their charge, from Taler without proper authority.

134. The Individual Defendants have withdrawn or caused to be withdrawn funds and assets from Taler for improper purposes to their own financial gain.

135. The Individual Defendants embezzlement has caused Plaintiffs to sustain damages.

WHEREFORE, Plaintiffs demand judgment against the Individual Defendants as follows:

    a.  Enjoining the Individual Defendants from transferring, disposing of, selling, encumbering or hypothecating any accounts, inventory, leases, equipment, real

estate or other assets of the Individual Defendants without the consent of Plaintiffs;

b. Directing that Defendants turn over all books and records relating to all of the Individual Defendants' bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets to the extent same reflect Plaintiffs' Investment or the profits or property derived therefrom;

b. Providing an accounting of all the Defendants' bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets;

c. Awarding compensatory damages, including prejudgment interest;

d. Awarding punitive damages;

e. Awarding attorney fees and cost of suit; and

f. Awarding such other and further relief as the Court may deem just, equitable and proper.

## ELEVENTH COUNT
**(Fraud in the Inducement against Defendants E. Braich, T. Braich, Dhillon and Nekrasoff)**

136. Plaintiffs repeat and reallege each of the paragraphs above as if set forth in full herein.

137. Induced solely by the Individual Defendants representations and relying on them, Plaintiffs made Plaintiffs' Investment.

138. Plaintiffs are informed and believe, and on that basis aver, the representations contained therein were false and the Individual Defendants knew the representations were false when they were made.

139.  When Plaintiffs discovered that the representations were false, Plaintiffs demanded that the Individual Defendants agree to return to Plaintiffs their Investment, but Defendants refused and still refuse to comply with either demand.

**WHEREFORE**, Plaintiffs demand judgment as follows:

a.  Enjoining the Individual Defendants from transferring, disposing of, selling, encumbering or hypothecating any accounts, inventory, leases, equipment, real estate or other assets of the Individual Defendants without the consent of Plaintiffs to the extent same reflect Plaintiffs' Investment or the profits or property derived therefrom;

b.  Directing that Defendants turn over all books and records relating to all of the Individual Defendants' bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets to the extent same reflect Plaintiffs' Investment or the profits or property derived therefrom;

c.  Providing an accounting of all the Defendants' bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets;

d.  Awarding compensatory damages, including prejudgment interest;

e.  Awarding punitive damages;

f.  Awarding attorney fees and cost of suit; and

g.  Awarding such other and further relief as the Court may deem just, equitable and proper.

## TWELFTH COUNT
### (Conversion against all Defendants)

140. Plaintiffs repeat and reallege each of the paragraphs above as if set forth in full herein.

141. As set forth above, Defendants took possession of, and converted for their own use and enjoyment, Plaintiffs' Investment.

142. Such unauthorized possession and conversion of Plaintiffs' Investment was done willfully and intentionally.

143. Because of Defendants' willful and intentional conduct, Plaintiffs have been damaged.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants as follows:

a. Enjoining Defendants from transferring, disposing of, selling, encumbering or hypothecating any accounts, inventory, leases, equipment, real estate or other assets of the Defendants without the consent of all shareholders to the extent same reflect Plaintiffs' Investment or the profits or property derived therefrom;

b. Directing that Defendants turn over all books and records relating to all of the Individual Defendants' bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets to the extent same reflect Plaintiffs' Investment or the profits or property derived therefrom;

c. Providing an accounting of all the Defendants' bank accounts, investment accounts, account payables, credit card statements, account receivables, contracts, inventory, leases, real property, and other assets to the extent same reflect Plaintiffs' Investment or the profits or property derived therefrom;

    d.   Awarding compensatory damages, including prejudgment interest;

    e.   Awarding punitive damages;

    f.   Awarding attorney fees and cost of suit; and

    g.   Awarding such other and further relief as the Court may deem just, equitable and

       proper.

Dated: New York, New York
      June 10, 2008

          /S/ William M. Poppe
        WILLIAM M. POPPE, ESQ. (WP6961)
        **POPPE & BHOURASKAR, LLP**
        *Attorney for Plaintiffs Roger Menda and*
        *Punit Menda*
        350 Fifth Avenue, Suite 7315
        New York, New York 10118
        Tel: 212-695-1515
        Fax: 212-629-8691
        Email: wpoppe@pblegal.com

EXHIBIT "A"

New York, New York
August 29, 2006

Whereas on August 24th in the year 2006, Erwin Singh Braich, as agent for the beneficial shareholder(s) of Taler Resources Incorporated, an Antiguan corporation, and Punit Menda as representative of the Menda family (Mr. and Mrs. Roger Menda and/or their two sons) entered into an agreement in preliminary form. This meeting took place on the second floor of the Red Roof Inn located on 32nd Street, New York, New York.

Whereas pursuant to this agreement the Menda family will make three payments of $150 thousand U.S. funds each for a total of $450,000 for the acquisition of 10% (ten percent) of the outstanding and issued shares of Taler Resources Incorporated. Other terms and conditions have been broadly discussed. Certain terms and conditions will require the advice of professional advisors.

Whereas the first of three payments is to be made on or before August 29, 2006. The second payment of $150,000 on or before October 25th, 2006 and the third and final payment of $150,000 on or before December 23rd, 2006. Each payment to be wired as directed by Taler Resources Incorporated.

Whereas, pursuant to the above described acquisition, the only material beneficial asset that the Menda family will acquire is an interest in a scrap metal contract totaling 600,000 metric tonnes in the name of Taler Resources Incorporated. This contract relates to various scrap situated in the Democratic Republic of Congo.

Whereas Taler Resources Incorporated represents that it has no material debts whatsoever.

Pursuant to the preliminary agreement, between the parties above, a comprehensive and detailed written contract for the aforementioned purchase and sale of equitable shares is to be drafted by the respective attorneys as selected. Pursuant to the above payment schedule the first installment of $150,000 has been made by the Menda family.

As agreed by all parties, in the event that a mutually acceptable written contract is not agreed upon and duly executed by all parties (for whatever reason by either side) this first payment is to be considered as a non interest bearing demand loan to be repaid within seventy two hours of notice.

The $150,000 has been received by Mr. Satinder Dhillon (as directed by Taler Resources Incorporated) and as per agreement is to be repaid by Mr. Satinder Dhillon, in the event the contemplated transaction between the parties is not finalized by October 25th, 2006. As described above the Menda family may elect to not formalize this arrangement with Taler Resources Incorporated as relates to the one existing contract for scrap metal in the Democratic Republic of Congo, and upon seventy two hours notice upon Mr. Satinder Dhillon served by email at satinderdhillon2004@yahoo.ca will be repaid the first installment.

Accepted and agreed;


_____
Satinder Dhillon

MICHAEL BYUNGMOO KIM
Notary Public State of New York
No. 01KI4779643
Qualified in New York County
Commission Expires March 30, 2007

8/30/2006

EXHIBIT "B"

# DOMESTIC WIRE (USA DESTINATION)

**WIRE:**  From Account: 29010840   Currency: US Dollars

Status:    **Processed** - Confirmation Number is 2400428386.
           **Wire Fee: $12.50**

| Beneficiary | Bank |
|---|---|
| **Satinder Dhillon** <br> **#2816- 1942 Westlake Ave.** <br> **Seattle, Washington** <br> **98101** <br><br> Phone: 360-220-0266 | Name: **BANK OF AMERICA, N.A., NY** <br> ABA: **026009593** <br> Address: <br> **NEW YORK** <br> **New York** |

Beneficiary's Account number: 68110972

Amount: **$150,000.00**

Date of transfer(s): **August 28, 2006**

Description: **Taler Resources Investment**

[ Save as model ]    Model Name: Satinder Dhillon

[ Process another Wire ]

## COMPLETED WIRES

| Here is the wire information: | |
|---|---|
| Setup By: | PUNIT MENDA |
| Date: | September 11, 2006 |
| Reference #: | G0062542536701 |
| Amount: | $35,000.00 |
| Source Account: | 29010840 (Checking) |
| Beneficiary Name: | JACK CHARLES MORRISON |
| Address: | |
| Phone: | |
| Bank Name: | RAWBANK |
| Branch Address: | CONCORDE: NO. 3487, BOULEVARD DU 30 |
| Branch City: | KINSHASA |
| Country: | CONGO, THE DEMOCRATIC REP |
| Currency: | USD |
| SWIFT: | RAWBCDKI |
| JACK CHARLES MORRISON's account at RAWBANK: | 0010280601-07 |
| Special Instructions (Invoice#, Purchase Order#, etc.): | |

◀ Back

Main Menu > Transfers and Payments >                                   Help

## COMPLETED WIRES

| Here is the wire information: | |
|---|---|
| Setup By: | PUNIT MENDA |
| Date: | September 12, 2006 |
| Reference #: | 20060912B1Q8024C005467 |
| Amount: | $40,000.00 |
| Source Account: | 29010840 (Checking) |
| Beneficiary Name: | SATINDER DHILLON |
| Address: | #2816- 1942 Westlake Ave Seattle, Washington 98101 |
| Phone: | 206-461-0800 |
| Bank Name: | BANK OF AMERICA, N.A, NY |
| Bank ABA#: | 026009593 |
| Branch Address: | |
| Branch City: | NEW YORK |
| State: | NY |
| SATINDER DHILLON's account at BANK OF AMERICA, N.A., NY: | 68110972 |
| Special Instructions (Invoice#, Purchase Order#, etc.): | |

◀ Back

Main Menu > Transfers and Payments >                                                    Help

## COMPLETED WIRES

| Here is the wire information: | |
|---|---|
| Setup By: | PUNIT MENDA |
| Date: | October 31, 2006 |
| Reference #: | 20061031B1Q8023C006493 |
| Amount: | $25,000.00 |
| Source Account: | 29036639 (Checking) |
| Beneficiary Name: | TALIA BRAICH |
| Address: | 33474 Kingsley Terrace<br>Abbotsford, British Columbia<br>V2S 6J6, Canada |
| Phone: | |
| Bank Name: | BANK OF AMERICA, N.A., NY |
| Bank ABA#: | 026009593 |
| Branch Address: | |
| Branch City: | NEW YORK |
| State: | NY |
| TALIA BRAICH's account at BANK OF AMERICA, N.A., NY: | 004834021620 |
| Special Instructions (Invoice#, Purchase Order#, etc.): | |

◀ Back

Main Menu > Transfers and Payments >    Help
## DOMESTIC WIRE (USA DESTINATION)

**WIRE:**    From Account: **29036639**   Currency: **US Dollars**

Status:    **Processed** - Confirmation Number is 3050666386.
**Wire Fee: $12.50**
Saved as Model

| Beneficiary | Bank |
|---|---|
| **Talia Braich**<br>33474 Kingsley Terrace<br>Abbotsford, British Columbia<br>V2S 6J6, Canada | Name: **BANK OF AMERICA, N.A., NY**<br>ABA: **026009593**<br>Address:<br>**NEW YORK**<br>**New York** |

Beneficiary's Account number: **004834021620**

Amount: **$10,000.00**
Date of transfer(s): **November 1, 2006**
Description: **Taler Resources**

[Save as model]    Model Name: Talia Braich

[Process another Wire]

# DOMESTIC WIRE (USA DESTINATION)

**WIRE:**    From Account: **29036639**    Currency: **US Dollars**

**Status:**    **Processed - Confirmation Number is 3391066995.**
**Wire Fee: $12.50**

| Beneficiary | Bank |
|---|---|
| **HWB – ESQ. PLLC IOLTA ACCOUNT**<br>**PO BOX 13085**<br>**Mill Creek, WA 98082**<br><br>Phone: 206-774-0845 | Name: **BANK OF AMERICA, N.A., NY**<br>ABA: **026009593**<br>Address:<br>    **NEW YORK**<br>    **New York** |

Beneficiary's Account number: **50515014**

Amount: **$40,000.00**

Date of transfer(s): **December 5, 2006**

Description: **Taler Investment**

[Save as model]    Model Name:  HWB - ESQ. PLLC IOLTA  ACCOUNT

[Process another Wire]

Help

# DOMESTIC WIRE USING MODEL

**WIRE:**    From Account: **29036639**  Currency: **US Dollars**

**Status:**    **Processed** - Confirmation Number is **3100292366.**
                **Wire Fee: $12.50**

| Beneficiary | Bank |
|---|---|
| **TALIA BRAICH**<br>33474 Kingsley Terrace<br>Abbotsford, British Columbia<br>V2S 6J6, Canada | Name: **BANK OF AMERICA, N.A., NY**<br>ABA: **026009593**<br>Address:<br>    **NEW YORK**<br>    **New York** |

Beneficiary's Account number: **004834021620**

Amount: **$40,000.00**

Date of transfer(s): **November 6, 2006**

Save as model

Process another Wire    Model Name: TALIA BRAICH